UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Civil Case No. |
| ) | |
| 97,417.246135 Tether USDT ) | |
| Seized from TRON Address ) | |
| TXb8SULXwZK2LqQZE6ugsLe78pN ) | |
| JnBkun2 ) | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

COMES NOW the United States of America (the "United States" or the "Government"), by and through Tara M. Lyons, Acting United States Attorney for the Southern District of Georgia, and J. Bishop Ravenel, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *In Rem*, with the following allegations:

**NATURE OF THE ACTION**

1. *In Rem* civil forfeiture is permissible under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2. The Defendant *In Rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) on the grounds that the Defendant Property, as defined later herein, is proceeds traceable to and/or derived from wire fraud in violation of 18 U.S.C. § 1343, wire fraud attempt and conspiracy in violation of 18 U.S.C. § 1349, and interstate transportation of stolen property in violation of 18 U.S.C. § 2314, as well as property involved in, or traceable to such property involved

in, money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

## THE DEFENDANT *IN REM*

3.  The Defendant *In Rem* (hereinafter, the **"Defendant Property"**) represents the following asset: "97,417.246135 Tether USDT Seized from TRON Address TXb8SULXwZK2LqQZE6ugsLe78pNJnBkun2." The **Defendant Property** was seized on or about January 30, 2025, from Tether Limited ("Tether") via digital transfer, executed remotely as the result of a federal seizure warrant authorized in the Southern District of Georgia on October 22, 2024. TRON Address TXb8SULXwZK2LqQZE6ugsLe78pNJnBkun2 is referred to herein as the **Target Account**.

## JURISDICTION AND VENUE

4.  The United States brings this action *In Rem* in its own right to forfeit the **Defendant Property**.

5.  This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345.

6.  The Court has jurisdiction over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

7.  The Court has *In Rem* jurisdiction over the **Defendant Property** pursuant to 28 U.S.C. § 1355(b).

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because acts and/or omissions giving rise to the forfeiture of the **Defendant Property** occurred in this district.

9. Particularly, wires in furtherance of this fraud scheme began, continued, and/or completed in the Southern District of Georgia; acts in furtherance of a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343) occurred in the Southern District of Georgia; and attempts to commit violations of 18 U.S.C. § 1343 (in violation of 18 U.S.C. § 1349) occurred in the Southern District of Georgia.

10. Further, acts in furtherance of a violation of 18 U.S.C. § 2314 occurred in the Southern District of Georgia.

11. Additionally, acts in furtherance of violations of 18 U.S.C. §§ 1956, 1956(h), and 1957 occurred in the Southern District of Georgia; violations of the underlying specified unlawful activities, as described in the previous two paragraphs, occurred in the Southern District of Georgia; and attempts to commit 18 U.S.C. §§ 1956 and 1957 occurred in the Southern District of Georgia.

12. The **Defendant Property** is currently in the possession of the United States Marshals Service ("USMS") and was seized from Tether, a cryptocurrency company operating in the United States including but not limited to in Georgia, as defined below.

13. The **Defendant Property** is not tangible.

## BACKGROUND INFORMATION

14. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute

for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency include Bitcoin, Litecoin, and Ether.

15. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object or managed by a software program.

16. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.

17. Generally, cryptocurrency is not issued by any government, bank, or company. Instead, cryptocurrency is generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Cryptocurrency is not illegal in the United States.

18. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and then generate, store, or generate and store public and private keys used to send and receive cryptocurrency. A public key, or public address, is akin to a bank account number, and a private key, or private address, is akin to a PIN number or password that allows a user to access and transfer value associated with the public address or key.

19. To conduct transactions on a blockchain, an individual must use the public address as well as the private key. A public address is represented as a case-sensitive string of letters and numbers, 26 to 42 characters long depending on the type of cryptocurrency. Each public address is controlled and/or accessed through the use of a unique corresponding private key — the cryptographic equivalent of a password or PIN — needed to access the address. Only the holder of a public address's private key can authorize any transfers of cryptocurrency from that cryptocurrency public address to another cryptocurrency address.

20. To send cryptocurrency from one address to another, an internet and/or cellular network must be used for the wallet software or exchange to query the blockchain, which is distributed among computer systems around the world, and announce transactions to be validated and confirmed.

21. An actor must have control or access of the private key or account credentials in order to move funds from one cryptocurrency address to another. If those assets have been moved without the owner's consent, unauthorized access of the user's private keys has likely occurred through the compromise of credentials or an associated computer system holding those credentials.

22. Criminal actors often move funds through a variety of addresses, swap assets from one type of cryptocurrency to another and bridge assets from one blockchain to another in order to obfuscate the source of illicit funds. Often the chain of addresses, swaps, and bridging will end at a cryptocurrency exchange that is not cooperative with law enforcement.

23. The following definitions apply to the activity discussed herein:

a. **Virtual currency**: Virtual currency (also known as a virtual asset or cryptocurrency) is a digital representation of value that can be digitally exchanged, traded, or transferred directly person-to-person, through a virtual asset service provider, or through other intermediaries. Virtual currency is generally not issued by any government or bank, but is instead generated and controlled through software operating on networks of computers across the world. Bitcoin, the most well-known virtual currency, is one of thousands of types of virtual currency in use.

b. **Public address**: Virtual currency public addresses are the specific virtual locations where virtual currencies can be sent and received. A public address is analogous to a bank account number in that it can be provided to others for the purpose of facilitating incoming transactions. Bitcoin addresses are represented as 26-to-35-character-long case sensitive strings of letters and numbers. Ethereum addresses are 42 characters and are not case-sensitive.

c. **Private key**: Each public address is controlled using a unique corresponding private key, a cryptographic equivalent of a password or a personal identification number ("PIN") needed to access the address. Only the holder of a public address's private key can authorize a transfer of virtual currency from that public address to another public address.

d. **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC or US Dollar Coin is a

stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

  e. **Tether (USDT):** Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT.

  f. **Blockchain:** Virtual currency transactions are recorded on what is known as to the blockchain. The blockchain is a distributed and immutable public ledger. For example, the Bitcoin blockchain records every public address that has ever received bitcoin, every transaction, and all known balances. The Bitcoin blockchain and the blockchains of most other virtual currencies are visible online to everyone. Investigators can trace virtual currency transactions from address to address by analyzing the public blockchain. Through legal process and using other evidence, investigators can attribute public addresses to individuals and entities.

  g. **Bridge:** Decentralized finance platform that allows for values to be transferred from one blockchain to another.

  h. **Tokens:** Digital assets built on top of some other existing distributed ledger technology and created by smart contracts.

24.  The following accounts are relevant as they are necessary to show the flow of funds from the Victim Account to the **Target Account**, from which the **Defendant Property** was seized:

  a. 0x1dDF24D6c02683fa3Dd7DF8a2288Cc4EcD5B41a7 ("**Subject Address 1**"),

b. 0x9840827308eeBeDB503fE788bF83f8Bb94dbEa00 ("**Subject Address 2**"),

c. TJn6R2SmbGjWQGGh7e4afVihbRUfcxhkvP ("**Subject Address 3**"),

d. TKkfdhWkpNiPtEGnMKiKBFak1hCLC35jkJ ("**Subject Address 4**"), and

e. TS5qXJ473HeR7eUNb437iuoGebjYyPyy4F ("**Subject Address 5**").

## FACTS AND BASIS OF FORFEITURE

25. On October 3, 2024, a resident of Richmond Hill, Georgia ("Victim 1") within the Savannah Division of the Southern District of Georgia, reported the unauthorized access and theft of cryptocurrency from his Ethereum address.

26. Victim 1 has held virtual assets in Ethereum address beginning with 0x39027... ("Victim Address") since September 9, 2020, and accessed them frequently from Victim 1's residence in Richmond Hill.

27. As of October 2, 2024, Victim 1 noticed several unauthorized transactions on his Ethereum address from September 26, 2024 including the transfer of 13,356,808,388.598047537886409634 Pepe Tokens, 4,098,489,299.37806069 PeiPei Tokens, two swaps of lower value tokens for Ether, and two transfers of Ether to **Subject Address 1**.

28. All unauthorized transactions on the victims account were conducted between 12:37:47 UTC and 13:21:23 UTC on September 26, 2024.

29. The remaining balance after the unauthorized transactions were finalized was the equivalent of approximately $13.00.

30. The total loss approximate loss in value as of the date of the theft from the victim account was $124,000.

31. Upon discovery of the theft of assets, Victim 1 filed a police report with the Bryan County Sheriff's department and with the FBI's Internet Complaint Center prior to reporting to the Savannah, Georgia FBI Office on October 3, 2024.

*Movement and Tracing of Funds*

32. All activity in **Subject Address 1** occurred on September 26, 2024 between 12:40:59 UTC and 13:29:11 UTC and included the conversion of multiple asset types and the transfer of funds out of the address.

33. From approximately 12:37:47 UTC on September 26, 2024 through approximately 13:21:23 UTC September 26, 2024, nine internal swap transactions were made culminating in the transfer of 121,979.817112 USDT and 0.40586583 ETH to **Subject Address 2**.

34. **Subject Address 2** received 121,979.817112 USDT and 0.40586583 ETH from **Subject Address 1** at 13:04:59 UTC and 13:29:11 UTC, respectively, on September 26, 2024.

35. On September 30, 2024, a total of 120,268.27 USDT on Ethereum was transferred from **Subject Address 2** into decentralized finance platform Defiway.com in three separate transactions.

36. Defiway.com is a platform which allows assets to be bridged from one blockchain to another.

37. On September 30, 2024, 30,076.08834 USDT was transferred at 05:56:35 UTC, 45,096.090888 USDT was transferred at 06:10:11 UTC, and 45,096.091439 USDT was transferred at 06:22:23 UTC into Defiway.com.

38. Information provided by a blockchain security company indicated these assets were bridged from the Ethereum to the Tron network and sent on to **Subject Address 3**, which received three transfers of USDT from Defiway.com on September 30, 2024 of 30,000 USDT, 45,000 USDT, and 45,000 USDT at 05:58:54 UTC, 06:12:30 UTC, and 06:24:21 UTC, respectively.

39. **Subject Address 3** sent 120,000 USDT at 06:36:00 UTC on September 30, 2024 to **Subject Address 4**.

40. **Subject Address 4** sent 77,822 USDT and 15,000 USDT to the **Target Account**, from which the **Defendant Property** was seized, at 09:34:48 UTC and 03:30:12 UTC, respectively, on September 30, 2024.

41. An additional 50,000 USDT was sent from **Subject Address 4** to **Subject Address 5**, at 09:47:51 UTC on September 30, 2024.

42. The above virtual currency tracing has shown that the stolen funds were laundered through several virtual currency addresses, including **Subject Addresses 1, 2, 3, and 4**, and ultimately received by the **Target Account**, from which the **Defendant Property** was seized.

43. The rapid movement of funds through **Subject Addresses 1, 2, 3, and 4**, and then on to **Subject Address 5** and the **Target Account**, from which the

**Defendant Property** was seized, served no apparent business purpose and incurred fees for each transaction made.

44.    **Subject Addresses 1, 2, and 3** had limited transaction history and appear to have been created for the purposes of moving Victim 1's funds; concealing and disguising the nature, location, source, ownership, and control of the proceeds of violations of 18 U.S.C. § 1343, 1349, and 2314; and conducting and attempting to conduct monetary transactions in criminally derived property of a value greater than $10,000 and derived from violations of 18 U.S.C. § 1343, 1349, and 2314.

45.    **Subject Addresses 1, 2, 3, 4, and 5,** and the **Target Account** and **Defendant Property** were used to conceal and disguise the nature, location, source, ownership, and control of the proceeds of violations of 18 U.S.C. § 1343, 1349, and 2314; and to conduct and attempt to conduct monetary transactions in criminally derived property of a value greater than $10,000 and derived from violations of 18 U.S.C. § 1343, 1349, and 2314.

46.    Accordingly, these movements of cryptocurrency were money laundering transactions and the accounts and property contained therein were involved in the commission of money laundering offenses in violation of 18 U.S.C. §§ 1956, 1956(h), and 1957.

47.    A payment of Ether and USDT was reserved and made out of **Subject Account 2** on October 1, 2024 to a separate address after the rest of the funds had been moved through to the **Target Account** to an entity with an Ethereum address.

48. This payment likely represents a payout to a separate individual as part of a broader conspiracy.

49. Tracing of additional funds leaving **Subject Address 5** show payments to an uncooperative financial institution based in Cambodia.

50. The below chart depicts the flow of funds as described above:



51. This criminal scheme involved the use of interstate and foreign wires and impacted interstate and foreign commerce.

52. As a result of the facts set forth herein, the **Defendant Property** constitutes property that was involved in money laundering with the purpose of concealing and disguising the nature, location, source, ownership, and control of the wire fraud, wire fraud conspiracy, and interstate transportation of stolen property proceeds; was involved in monetary transactions exceeding $10,000 in these criminal proceeds; and also constitutes the proceeds of the wire fraud, wire fraud conspiracy,

and interstate transportation of stolen property offenses, which pooled in the account holding the **Defendant Property** after being laundered through several intermediate accounts.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C))

53. The United States incorporates by reference the allegations contained in paragraphs 1 through 52 above as if set forth fully herein.

54. The **Defendant Property** is property that constitutes and/or is derived from proceeds traceable to one or more violation and/or attempted violation of 18 U.S.C. §§ 1343 and 1349.

55. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Second Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C))

56. The United States incorporates by reference the allegations contained in paragraphs 1 through 52 above as if set forth fully herein.

57. The **Defendant Property** is property that constitutes and/or is derived from proceeds traceable to one or more violation of 18 U.S.C. § 1349, which is a conspiracy to violate 18 U.S.C. § 1343.

58. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Third Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

59. The United States incorporates by reference the allegations contained in paragraphs 1 through 52 above as it set forth fully herein.

60. The **Defendant Property** is property that constitutes and/or is derived from proceeds traceable to one or more violation and/or attempted violation of 18 U.S.C. § 2314.

61. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Fourth Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

62. The United States incorporates by reference the allegations contained in paragraphs 1 through 52 above as if set forth fully herein.

63. The **Defendant Property** is property that was involved in a financial transaction or attempted financial transaction, and/or is property traceable to such property, in violation of 18 U.S.C. § 1956.

64. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Fifth Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

65. The United States incorporates by reference the allegations contained in paragraphs 1 through 52 above as if set forth fully herein.

66. The **Defendant Property** is property that was involved in a monetary transaction or attempted monetary transaction, and/or is property traceable to such property, in violation of 18 U.S.C. § 1957.

67. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## Sixth Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

68. The United States incorporates by reference the allegations contained in paragraphs 1 through 52 above as if set forth fully herein.

69. The **Defendant Property** is property that was involved in, or traceable to such property, a conspiracy to commit a violation of 18 U.S.C. §§ 1956 and/or 1957, in violation of 18 U.S.C. § 1956(h).

70. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## CONCLUSION

71. WHEREFORE, the United States of America prays that:

    a.    Process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the **Defendant Property**;

    b.    The **Defendant Property** be forfeited and condemned to the use and benefit of the United States;

    c.    The United States be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper; and

    d.    That due notice be given to all parties to appear and show cause why the forfeiture of the **Defendant Property** should not be decreed.

Respectfully submitted,

TARA M. LYONS
ACTING UNITED STATES ATTORNEY

By:    */s/ J. Bishop Ravenel*
J. Bishop Ravenel
Assistant United States Attorney
Virginia Bar Number 70250
P.O. Box 8970
Savannah, GA 31412
(912) 652-4422

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent Jamie Butcher Nestor, have read the foregoing Complaint for Forfeiture *In Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 18th day of March 2025.

_____
Jamie Butcher Nestor
Special Agent
Federal Bureau of Investigation